**Harold HARDING and Rose Harding, Plaintiffs-Appellants,**

v.

**MODERN INCOME LIFE INSURANCE COMPANY, Defendant-Respondent.**

**No. KCD 30339.**

Missouri Court of Appeals, Western District.

Dec. 31, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 4, 1980.

Application to Transfer Denied March 11, 1980.

Jerold L. Drake, Grant City, for plaintiffs-appellants.

Scott Ross, Maryville, for defendant-respondent.

Before WASSERSTROM, C. J., and WELBORN and BARNES, Special Judges.

WASSERSTROM, Chief Judge.

Suit to recover damages for fraud. The jury awarded plaintiffs $7,459.20 actual damages and $4,500.00 punitive damages. The trial court, however, entered judgment in favor of defendant notwithstanding the verdict or in the alternative granted a new trial. The basis for the trial court's entry of judgment in favor of defendant was that plaintiffs' cause of action had become barred by the statute of limitations. With respect to the alternative grant of a new trial, the trial court held that the verdict directing instruction was incorrect in that one of the alternative submissions did not constitute actionable fraud, and the damage instruction was incorrect because it was based upon MAI 4.01 instead of MAI 4.03.

The evidence taken most favorably for the plaintiffs shows the following facts. Plaintiff Harold Harding is a farmer with an eighth grade education. On September 20, 1966, Robert VanHoutan, an agent for Future Security Life Insurance Company, came to plaintiffs' farm and upon encountering Harding on his way back from performance of chores asked him if he would be "interested in making some money." Harding did become interested and gave VanHoutan permission to return in order to discuss his proposition with Harding and his wife. Soon thereafter VanHoutan did return with another agent, Charles Sorg, and those two agents together with the plaintiffs had a meeting at plaintiffs' house around the dining room table.

In the course of that conversation, VanHoutan and Sorg told plaintiffs that "Pathfinder Contracts" being offered by them would make plaintiffs money; that the contracts would put plaintiffs' five children through college; that plaintiffs would have to pay on the contracts for only five years and that plaintiffs would have all of their money back by ten years and after that plaintiffs would get $30,000 annually per contract; that plaintiffs' money would be invested in gypsum mines, motels and resorts; that the contracts were investments; that Future Security was a profit sharing company and that if plaintiffs would get in on the ground floor of the new company they would make all kinds of money and share in 35% of the profits of the company. The agents did tell plaintiffs that they would be buying insurance but added that the insurance "was a sideline." Plaintiff Harold Harding testified he would not have purchased the contracts had he known that they were insurance only.

In reliance upon the agents' representations, plaintiffs purchased five Pathfinder Contracts, one being for each of their children. The agents produced certain forms for signature, which were the usual type of application forms for life insurance, and plaintiffs did sign the five applications.

In the latter part of 1966 or the early part of 1967, Sorg delivered five Pathfinder Contracts issued by Future Security to plaintiffs, which were in fact ordinary life insurance policies with endowment and dividend features.[1] At about the same time, plaintiffs also received five copies of a "Certificate of Participation" by which Future Security acknowledged that plaintiffs had a "beneficial interest in the annual profits of Future Security Life Insurance Company" and that the company's policy shall be to appropriate no less than 35% of the total divisible surplus of the company in each fiscal year to the payment of dividends to the holders of Pathfinder Contracts provided as many as 10,000 contracts were issued, but that if such volume were not attained then the percentage of profits to be so allocated shall be reduced proportionately. The Certificate also stated, "This Resolution does not constitute a guarantee that the corporation will have an annual profit in any particular year."

In addition, plaintiffs received a "study and analysis" by Insurance Reporting Service of the Pathfinder Contract. This brochure stated in the first paragraph: "For more than 100 years, life insurance companies have issued 'special contracts' of one type or another." The brochure then went on to analyze the policy terms of the Pathfinder Contract, with emphasis on the Guaranteed Annual Endowments and the sharing in the divisible surplus of the company through annual dividends after the second year. Statements were also included that the company had been able to save on advertising because of the cooperative effort of policyholders in assisting in sales to friends and neighbors, and that such cooperation had put the company in a position to earn larger profits.

Plaintiffs were also advised that they had become members of an "Advisory Board" and received a document entitled "Advisory Board Duties, Future Security Life." This document was in effect a program by which the policy holders were to assist in the selling program of the company, a key feature of which was the holding of "booster meetings." Harold Harding attended three such meetings, at which he was complimented on purchasing the Pathfinder Contracts, and speeches were made repeating and amplifying upon the statements which had been made to plaintiffs at their home by VanHoutan and Sorg.

At the time of taking out the Pathfinder Contracts in 1966, plaintiffs paid the initial premiums totaling $1,380.80. Again in the fall of 1967, they paid the second premiums aggregating the same sum. On neither of those payments were there any reductions by way of endowment or dividend credits. Harold Harding testified that after that second payment he became suspicious and wrote a letter of inquiry to the company, and that he sent a similar such letter about once a year thereafter. The suspicion which led to the sending of the inquiry after the second premium stemmed from the lack of dividends as had been promised by the agents and at the booster meetings. However, the record shows that plaintiffs did receive "endowment" credits for each year commencing 1968 aggregating $345.20 annually; and they received dividend credits which came to $176.90 in 1968 and increased each year thereafter until 1972, when plaintiffs ceased paying any premiums.

Harold Harding testified that he never received any response from the company to

---

1.  Each policy contains the following provisions:
    "ANNUAL PREMIUM INCLUDED ABOVE FOR PURE ENDOWMENT $30.50"

    \*   \*   \*   \*   \*   \*

    "GUARANTEED ENDOWMENT
    "At the end of the second policy year and at the end of each succeeding policy year until and including the twentieth policy year, provided all previous premiums have been paid to date, the Company will pay to the owner, in cash, an amount equal to the annual pure endowment specified above. Such annual pure endowment will be in addition to any annual dividend apportioned to the policy but may be applied in accordance with the dividend options contained in this policy.
    "ANNUAL DIVIDEND
    "In accordance with the Dividend Provisions, this policy will share in the divisible surplus derived from the participating business of the Company, to the extent apportioned to it by the Company."

any of his letters of inquiry until 1972. He then received a letter dated September 11, 1972, thanking him for his letter concerning the five policies, and the letter went on to state: "When the agent sold you the policies, he over estimated the progress of them." This letter seems to supply the reason for plaintiffs' cessation in payment of premiums thereafter.

Plaintiffs then made complaint to the Missouri Division of Insurance, which commenced an investigation in 1973. As part of that procedure, Future Security sent a letter to the Division of Insurance enclosing a form letter addressed to the President of Future Security and purportedly signed by Harold L. Harding, in which Harding purportedly acknowledged:

"Today, your representative, R. L. Van-Houtan, has thoroughly explained to me your Future Security 'Pathfinder Contract,' by using the Presentation Kit and Tablet Talk. * * *

"I further state that I have not been offered or promised stock in Future Security Life Insurance Company, or any other Corporation, as an incentive for the purchase of said Contract.

"I understand that this is an insurance policy on the life of the insured. The amount of dividends, or years required for this Contract to be self-sustaining cannot be guaranteed. I also understand by leaving guaranteed endowments to accumulate with interest for twenty (20) years, the 'Pathfinder Contract' will be paid-up in full, and I will continue to share in the earnings of Future Security Life Insurance Company. * * * "

That "President's letter," purportedly signed by Harding, was referred to a handwriting expert for examination, together with specimen of Harding's signature known to be genuine. The handwriting expert reported and testified at trial that the purported signature on the "President's letter" was a forgery.

Harold Harding testified that neither he nor his wife read the "Pathfinder Contract" or the other documents received by him from Future Security until late 1972 or early 1973. (Some of the documents were not read until just before trial.) In 1974, Future Security merged into defendant Modern Income Life Insurance Company, and plaintiffs received five Certificates of Assumption issued by Modern Income. Apparently in connection with that merger, plaintiffs also received a certificate for 31 shares of capital stock in Modern Income.[2] The present suit was filed May 14, 1976.

Plaintiffs' first point on appeal is that the trial court erred in entering judgment notwithstanding the verdict, because the trial court wrongly concluded that plaintiffs' cause of action was barred by limitations. Plaintiffs' other two points relate to the alternative grant of a new trial. Inasmuch as we conclude that the trial court was correct in granting judgment to defendant notwithstanding the verdict, plaintiffs' other points on appeal become moot and need not be discussed.

Defendant pleaded as an affirmative defense the five year period of limitations, and the facts of course show that this suit was filed more than five years after the alleged fraudulent sale of the policies in 1966. However, plaintiffs claim the benefit of the provision in Section 516.120(5), RSMo 1978, which states: "An action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud."

The effect of the statutory provision just quoted is to give plaintiffs five years to sue from the date when they knew or should have discovered the controlling facts. Plaintiffs claim that they did not know or discover the facts of fraud until 1973 when they were notified by the Division of Insurance that they had purchased purely insur-

---

2. There was no testimony to explain the reason for the issuance of this stock, but it may have been in exchange for 500 shares of the capital stock of Macalco, Inc. which had been issued to plaintiffs on May 23, 1969. The sparse testimony relating to plaintiffs' purchase of the Macalco stock will be referred to later in the body of this opinion.

ance policies. Defendant, on the other hand, rejoins that the burden of proof rested on plaintiffs to show their lack of actual or constructive knowledge (*Womack v. Callaway County*, 159 S.W.2d 630 [Mo.1942]), and that plaintiffs have failed in that burden of proof.

As stated, plaintiffs contend that they did not learn of the fraud until they received notification from the Missouri Division of Insurance in 1973. To show that they did not and should not be held to have knowledge of the true facts until that date which was within five years of their filing of suit, plaintiffs rely on the following factors as excusing their lack of any investigation: (1) the receipts by them of certificates of participation, notice that they were on an advisory board, a reassuring "analysis" of the Pathfinder Contract by an insurance reporting service acting on behalf of Future Security, and the oral statements and reassurances made at their home and at the booster meetings which they attended; (2) the letters allegedly sent by plaintiffs to Future Security commencing in 1968 and the alleged lack of response thereto; and (3) the forgery of Harold Harding's signature to the "President's letter." Each of these three categories will be examined in turn.

As to category No. 1, all of those documents and events occurred in 1966 or 1967. Thereafter in 1968 plaintiffs, according to their own testimony, became suspicious and did begin to make inquiry. Obviously those things which had already happened in 1966 and 1967 had ceased to have any operative force and cannot be relied upon by plaintiffs as excusing their failure to look at the written materials already in their own possession.

As to category No. 3, relating to the forged signature, that came to light in 1973 as part of the investigation by the Division of Insurance. That investigation had been instigated by the plaintiffs themselves and because of their opinion already reached that something was wrong. The forged letter did not dissuade plaintiffs from inquiry or lull them into any false sense of security. Rather, their discovery of that forgery in 1973 merely confirmed the suspicions already entertained by them and which already had caused them to complain to the Division of Insurance.

This leaves plaintiffs with category No. 2, having to do with the correspondence between plaintiffs and the company commencing in 1968. The record discloses very little concerning such correspondence, other than the bare testimony by Harold Harding that he wrote annually and received no response until the letter of September 11, 1972. Plaintiffs did not produce any copies of the letters written by them, nor did they ever seek to obtain copies of such letters in defendant's file by use of discovery. Some slight clue as to the nature of the correspondence, at least in part, is furnished however by the admission in testimony by Harold Harding that he corresponded with Future Security about the purchase of stock in that company:

"Q (By Mr. Ross): And in the fall of 1967, Mr. Harding, didn't you write the Future Security asking about purchasing some stock in Future Security?

A That's right.

Q And you received back a reply to the effect that they were sorry but that there wasn't any stock available in Future Security, isn't that correct?

A That's right.

Q And actually the stock that was available was the stock in this Macalco which you went ahead and bought, isn't that right?

A Macalco and Future Security was the same at that time.

Q But I'm asking you actually you did go ahead and buy stock shortly after that, didn't you?

A That's right.

Q And you bought stock in Macalco, is that right?

A Yes, but they was the same." [3]

3. The record contains a cancelled check in the sum of $1,000 from plaintiffs to Macalco, Inc., dated May 8, 1969, on which there appears the notation "500 Shares of stock in Future Securi-

Although obviously something transpired between the parties during the period 1968 to 1972, all of that remains vague and nebulous. If it were permissible to speculate, it would be tempting to infer that plaintiffs did come to a realization that there was a difference between the insurance policies which they had received and shares in the company which would entitle them to share more fully in the profits and equity growth of Future Security. But, of course, it is improper to enter upon any such speculation. In final analysis, it rested upon plaintiffs to more fully develop these facts. On the basis of the record as it stands, there can be no conclusion other than that plaintiffs failed to carry their burden of showing that they had not discovered the alleged fraud sooner than five years before suit and that there were circumstances which excused them from doing so.

Although the ancient doctrine of caveat emptor has become deeply eroded, nevertheless the law still requires some minimal measure of self-protection in business transactions. As applied specifically to the problem of discovery of fraud for purposes of limitations, the rule is stated in *Briece v. Bosso*, 158 S.W.2d 463 (Mo.App.1942), that if the party seeking the benefit of Section 516.120(5) to avoid the five year statute "had the means of discovery in his power, he will be held to have known" of the fraud. This concept of requiring reasonable self-protection was further defined in *Brown v. Irving-Pitt Mfg. Co.*, 316 Mo. 1023, 292 S.W. 1023 (1927), which established four categories of circumstances excusing failure to file suit within five years of the alleged fraud, as follows:

> "the exercise of requisite care and due diligence to discover the fraudulent facts relied on, or that the means of acquiring knowledge were without [plaintiffs']

power, or that an artifice, or trick to conceal was used, or that a fiduciary relation existed."

A hard fact of this case is that plaintiffs had received the insurance policies and related documentation which did specify just what they were getting, and they had all that material in their own possession at all times from and after 1966. Perhaps they were diverted from reading those documents and lulled into a false sense of security by oral representations in 1966 and early 1967. But those representations ceased to have such effect by 1968, when plaintiffs by their own admission became suspicious. Yet they continued to fail, according to their own testimony, to read the documents in their possession and did not file suit until 1976. The evidence fails to make a submissible case of any fiduciary relationship between plaintiffs and Future Security or any such concealment by that company (at least after 1967) which would excuse action on plaintiffs' part in at the very least reading or having read to them the documents in their possession, especially after their suspicions had become aroused no later than 1968. Cases cited by plaintiffs are factually distinguishable and do not hold to the contrary.

The trial court correctly ruled as a matter of law that plaintiffs' cause of action, if any, became barred by limitations. The judgment is therefore affirmed.

All concur.

ty Ins. Co." The record contains another exhibit consisting of a covenant by the plaintiffs not to sue Macalco, Inc., dated March 22, 1976, "arising in contract or tort from the alleged fraudulent sale of investments known as 'Pathfinder Contracts' (Nos. 627, 628, 629, 630, 631). This covenant not to sue also extends to the cause of action, if any, arising from the alteration and forgery of various documents relating to the sale of said Pathfinder Contracts."

The covenant reserved to the plaintiffs "all rights and claims against all other persons, firms or corporations, and specifically their cause of action against Modern Income Life Insurance Company for fraud, forgery, breach of contract and other theories of recovery."